1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

CANYON PARK BUSINESS CENTER
OWNERS' ASSOCIATION,

8

Plaintiff,

9

v.

C21-1694 TSZ

ORDER

10

PETE BUTTIGIEG, et al.,

11

Defendants.

12

13

14

15

16

17

18

19

THIS MATTER comes before the Court on cross-motions for summary judgment

brought by (i) plaintiff Canyon Park Business Center Owners' Association ("CPBCOA"

or the "Association"), docket no. 50, (ii) defendants Roger Millar and the agency of

which he is the Secretary, namely the Washington State Department of Transportation

("WSDOT"), docket no. 54, and (iii) defendants Pete Buttigieg, Stephanie Pollack, Ralph

Rizzo, and the Federal Highway Administration ("FHWA"),[1] docket no. 55. Having

reviewed all papers filed in support of, and in opposition to, the motions, and having

20

21

22

---

[1] The FHWA is an agency within the United States Department of Transportation ("USDOT");
Pete Buttigieg is the Secretary of Transportation, Stephanie Pollack is the Deputy Administrator
of the FHWA, and Ralph Rizzo is the Division Administrator of FHWA's Washington Division,
and they are all sued in their official capacities. *See* Am. Compl. at ¶¶ 23–26 (docket no. 18).

23

ORDER - 1

taken judicial notice of certain materials outside the administrative record,[2] the Court

enters the following Order.

**<u>Background</u>**

Washington's King and Snohomish Counties are transected by two freeways,

known as I-5 and I-405, which intersect north of Seattle (in Lynnwood) and south of

Seattle (in Tukwila).  Traffic on portions of I-405 is congested for many hours of the day

in both directions as a result of high regional demands and heavy volumes.  *See* WSDOT,

Transp. Discipline Report ("TDR") at § 1.3 (docket no. 35-8 at 281).  To increase vehicle

capacity and throughput, and to improve mobility and reliability, WSDOT has proposed a

project that will, among other things, add an express toll lane ("ETL") in each direction

of I-405 between State Route ("SR") 522 and SR 527 (between milepost ("MP") 21.79

and MP 27.06) (the "Project"), and create a direct access ramp and inline transit station

within the I-405 median at 17th Avenue SE in Bothell.[3]  *See* WSDOT & FHWA,

Environmental Assessment ("EA") at 1 (docket no. 38 at 2895).  The direct access ramp

is the focus of this litigation.

---

[2] The Court previously granted in part and deferred in part the Association's motion for judicial notice.  *See* Minute Order (docket no. 56).  The deferred portion of the motion is addressed in Section D of the Background.

[3] The Project is part of the larger I-405 Corridor Program, the purpose of which is "to improve personal and freight mobility and reduce foreseeable traffic congestion in the corridor in a manner that is safe, reliable, and cost-effective."  *See* USDOT, Record of Decision at 3 (docket no. 23-1 at 807).  The FHWA and the Federal Transit Administration are co-lead agencies with respect to the I-405 Corridor Program, which was developed in coordination with WSDOT, the King County Department of Transportation, and the Central Puget Sound Regional Transit Authority.  *Id.* at 1 (docket no. 23-1 at 805); *see also* 42 U.S.C. § 4332(2)(G) (as amended by Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 321(a)(5), 137 Stat. 10, 39 (2023)).

1    The Project area is highlighted in orange on the following map:



2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    *See* WSDOT & FHWA, Finding of No Significant Impact ("FONSI") at Ex. 1-1 (docket

22    no. 37-8 at 295).  The direct access ramp at issue is planned for the northern tip of the

23

ORDER - 3

Project area.  A drawing of the interchange between I-405 and SR 527, showing the configuration of the proposed direct access ramp [item 20], is reproduced below:



*See* EA at Ex. 3-2 (docket no. 38-1 at 1).

ORDER - 4

1    The current I-405/SR 527 interchange and transit station (Canyon Park Park-and-

2    Ride ("P&R") facility) is shown in this aerial view (looking northwest):



3

4

5

6

7

8

9

10

11    <u>See</u> EA at Ex. 4-13 (docket no. 38-1 at 24).  The proposed direct access ramp and

12

13    reconfigured transit station are visualized as follows:



14

15

16

17

18

19

20

21

22    <u>See</u> TDR at Ex. 5-17 (docket no. 35-8 at 354).

23

ORDER - 5

1    Plaintiff CPBCOA is a non-profit corporation comprised of owners of properties

2  located in the Canyon Park Business Center, *see* Am. Compl. at ¶ 7 (docket no. 18), the

3  borders of which are outlined in pink on the following map:



Canyon Park Study Area

4    *See* City of Bothell, Canyon Park Subarea Planned Action Final Environmental Impact

5  Statement ("Bothell Final EIS") at Fig. 19 (docket no. 49-1 at 87).  The Canyon Park

1    Business Center is home to various businesses and a church, and it includes a 135-acre

2    Native Growth Protection Area, which is undevelopable greenspace, as well as private

3    roads, bicycle paths, jogging trails, water detention ponds, and recreational areas.  Am.

4    Compl. at ¶¶ 8, 11, 12, 15, & 18 (docket no. 18).

5         In connection with the proposed construction of a direct access ramp to and from

6    the I-405 median at 17th Avenue SE, which will likely increase traffic on the streets near

7    the Canyon Park Business Center, the Association sues the federal defendants pursuant to

8    the Administrative Procedure Act ("APA") and all defendants for alleged violations of

9    the National Environmental Policy Act of 1969 ("NEPA").  *See id.* at ¶¶ 75–116 (alleging

10   six "causes of action," two of which are actually prayers for relief).  The crux of the

11   Association's claims are that (i) the FHWA (and WSDOT) should have prepared an

12   environmental impact statement ("EIS") relating to the Project, and/or (ii) the agencies

13   should have revised their Environmental Assessment after the City of Bothell issued the

14   Bothell Final EIS in connection with the separate project known as the Canyon Park

15   Subarea Planned Action.  All moving parties seek summary judgment in their own favor

16   on these issues.

17   **A.    NEPA Requirements**

18        NEPA "establishes 'action-forcing' procedures that require agencies to take a

19   'hard look' at [the] environmental consequences" of their proposed plans.  *See Ctr. for*

20   *Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (quoting

21   *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting *Robertson v. Methow*

22   *Valley Citizens Council*, 490 U.S. 332, 348 (1989))).  NEPA does not mandate any

23

particular result, but it compels the development of an EIS in certain situations, namely

when a proposal for legislation or other major federal action will "significantly" affect

"the quality of the human environment" and is not otherwise exempt from NEPA.  *See*

*Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756–57 (2004) (quoting 42 U.S.C.

§ 4332(2)(C)).  Pursuant to authority conferred by NEPA, the Council of Environmental

Quality ("CEQ") has promulgated regulations to guide federal agencies in determining

when an EIS is necessary.  *See id.* at 757.  In accordance with the CEQ's regulations, an

agency may prepare an EA, rather than an EIS, if the proposed action is not likely to have

significant effects or if the significance of the effects is unknown.  *See* 40 C.F.R.

§ 1501.5(a).  An EA must:

> (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; and
>
> (2) Briefly discuss the purpose and need for the proposed action, alternatives as required by . . . NEPA, and the environmental impacts of the proposed action and alternatives . . . .

40 C.F.R. § 1501.5(c).  NEPA dictates that "technically and economically feasible

alternatives" be evaluated.  *See* 42 U.S.C. § 4332(2)(F).

If an agency decides not to prepare an EIS, it must issue a FONSI and make it

available to the affected public.  40 C.F.R. § 1501.6(a).  The FONSI must either include

the EA or incorporate the EA by reference.  *Id.* at § 1501.6(b).  A FONSI may be with or

without mitigation, but if a FONSI is premised on mitigation, then it must state "any

enforceable mitigation requirements or commitments that will be undertaken to avoid

significant impacts."  *Id.* at § 1501.6(c).

**B.**     <u>**TDR, EA, and FONSI**</u>

In May 2020, WSDOT issued its Transportation Discipline Report, which later became Appendix A to the Environmental Assessment for the Project. <u>*See*</u> TDR (docket no. 35-8 at 273–473). The TDR

> describes the freeway and local traffic, safety performance, transit, freight, and nonmotorized conditions in the study area; identifies and assesses potential effects of the Project on these conditions; and identifies measures to avoid or reduce effects resulting from the Project.

<u>*Id.*</u> at § 1.1 (docket no. 35-8 at 281). The TDR considered two alternatives: "No Build" and "Build." <u>*See id.*</u> at § 1.4 (docket no. 35-8 at 281–82). For each alternative, the TDR provided an analysis of various street intersections, assigning a level of service ("LOS") value from A to F for each studied location, with A meaning little or no vehicle delay through the intersection, and F signifying "failure" or "extreme congestion."

| LOS | Average Delay per Vehicle (seconds) | | Description |
|:---:|:---:|:---:|:---:|
| | Signals and Roundabouts | Stop-Controlled | |
| A | 0–10 | 0–10 | Little or no delay |
| B | 10–20 | 10–15 | Short delays |
| C | 20–35 | 15–25 | Moderate delays |
| D | 35–55 | 25–35 | Long delays |
| E | 55–80 | 35–50 | Very long delays |
| F | >80 | >50 | Failure - extreme congestion |

<u>*Id.*</u> at Ex. 3-4 (docket no. 35-8 at 301). Software known as "Synchro" (for signalized and unsignalized intersections) and "SIDRA" (for roundabouts) was used, and methods set forth in the HIGHWAY CAPACITY MANUAL: A GUIDE FOR MULTIMODAL MOBILITY ANALYSIS [hereinafter "HCM"] were applied. <u>*Id.*</u> at § 3.4.3 (docket no. 35-8 at 300–01).

Within the region near the planned direct access ramp, the following intersections were studied:



*Id.* at Ex. 3-2 (docket no. 35-8 at 293) (modified).  Of particular note for purposes of CPBCOA's claims are the intersections labeled (i) P1–P5, private roads within the Canyon Park Business Center, (ii) 23 (17th Avenue SE and Canyon Park P&R), and (iii) N4 (17th Avenue SE and I-405 direct access ramp).[4]  For each intersection, the TDR

---

[4] The following intersections (shown on the map) were also studied, but they are not relevant to the Association's claims in this litigation:

| | |
|---|---|
| 16  Bothell-Everett Highway and 228th Street SE | 21  SR 527 and I-405 Southbound Ramps |
| 17  228th Street SE and 15th Avenue SE | 22  SR 527 and I-405 Northbound Ramps |
| 18  228th Street SE and 19th Avenue SE | 24  SR 527 and 220th Street SE |
| 19  228th Street SE and 27th Avenue SE | 25  SR 527 and 214th Street SE |
| 20  228th Street SE and 29th Drive SE | 26  SR 527 and 211th Street SE |
| | 27  SR 527 and SR 524 |

indicates the existing LOS (if applicable) and the anticipated LOS for each alternative (No Build and Build) during the morning ("AM") and evening ("PM") peak hours in both the years 2025 and 2045.  With one exception for each peak hour, the anticipated LOS is the same for the Build alternative as for the No Build alternative.[5]

**AM Peak Hour LOS**



Id. at Ex. 5-13 (docket no. 35-8 at 343–44) (modified); see also infra note 10.

_____

[5] The traffic near the Canyon Park Business Center is already congested.  The intersection of 23rd Drive SE and 220th Street SE (P3) currently operates at LOS E during the morning peak period as a result of "a single through lane that serves high traffic volumes on the eastbound approach," and the "all-way stop controlled" intersection of 20th Avenue SE and 220th Street SE (P2) is rated LOS F for the afternoon commute.  See TDR at § 4.3 (docket no. 35-8 at 309–10).  The situation is expected to worsen by 2025, regardless of whether the Project goes forward or the direct access ramp is built.  Id. at § 5.4.1 (docket no. 35-8 at 338–39).

1

**PM Peak Hour LOS**



11  *Id.* at Ex. 5-14 (docket no. 35-8 at 346–47) (modified); *see infra* note 10.  A subsequent

12  study performed by the City of Bothell analyzed the same intersections within or near the



13  Canyon Park Business Center, and

14  the City of Bothell's report offers

15  a more detailed map of the area.

16  The intersections labeled P2–P5

17  in the TDR correlate with the ones

18  marked as 1–4, respectively, on

19  the adjacent map.

20

21  *See* Addendum to City of Bothell's
   Draft EIS, Attachment C at Fig. 2

22  (docket no. 33-2 at 665) (modified).

23

1       In July 2020, WSDOT and the Washington Division of the FHWA submitted the

2   Environmental Assessment for the Project.  *See* EA (docket no. 38 at 2885).  The EA

3   describes the benefits of the Project as follows:

> The Project would deliver faster and more reliable trips on I-405 for most
> drivers, carpools, and transit riders using both the ETLs and general purpose
> (GP) lanes.  The additional freeway capacity in the Bothell area would
> increase overall vehicle and person throughput, reduce travel times, and
> improve safety performance.  The addition of direct access ramps at SR 522
> and near SR 527 would improve access for ETL users, and the new ETL
> coupled with new inline transit stations at SR 522 and near SR 527 would
> support Sound Transit's proposed I-405 [bus rapid transit] BRT system and
> improve transit reliability.

> The Project would benefit water resources by treating 100 percent of new
> pollution-generating impervious surface (PGIS) and a greater share of
> existing PGIS, leading to reductions in pollutant loading.  Aquatic species
> would benefit from the removal of four existing bridge piers in the
> Sammamish River.   Replacing five fish barriers with restored stream
> connections would improve anadromous fish access to approximately
> 24,330 linear feet of upstream habitat.  Although future noise levels would
> be similar with and without the Project, the Project's three proposed noise
> walls would decrease noise levels at 43 more residences than the No Build
> Alternative.

14  EA at 2–3 (docket no. 38 at 2896–97).  The EA further indicates that, in addition to these

15  improvements, the Project would result in some intersections in the Canyon Park area

16  operating more poorly.  *Id.* at § 2.4 (docket no. 38 at 2905).  The EA also makes

17  predictions about the Project's effects on transportation, noise and visual quality, air,

18  water, and soil quality, ecosystems (habitats and wildlife), recreational, community,

19  historic, and other resources, environmental justice populations, and hazardous materials

20  sites.  *Id.* at Ch. 4 (docket no. 38-1 at 3–39).  Notably, the Association does not challenge

21  any of the EA's findings other than those relating to the Project's impact on traffic near

22

23

ORDER - 13

and within the Canyon Park Business Center, which the Association asserts will create

more noise, air pollution, vibration, and safety risks for cyclists and pedestrians.  *See* Am.

Compl. at ¶¶ 45–73 (docket no. 18).  In preparing the EA, WSDOT coordinated with the

City of Bothell and CPBCOA,[6] and it is continuing to consider potential mitigation and

to work with the City of Bothell to reach agreement on appropriate assumptions about

future population growth and land uses in the Canyon Park region.  EA at §§ 2.3.1

(Ex. 2-1) & 2.4 (docket no. 38 at 2904–05).

In July 2021, the FHWA issued a finding of no significant impact, concluding that

the Project was "not likely to have a significant adverse impact on the environment."

FONSI at 1-1 (docket no. 37-8 at 295).  The FONSI relied on, and incorporated by

reference, the EA, with certain changes outlined in the Errata to the EA, which was

---

[6] The Association was actively involved and communicated extensively with WSDOT during the periods when the TDR and EA were being developed.  *See* Meeting Summary (Feb. 28, 2019), CAR00010194–95 (docket no. 25-2 at 132–33); Emails (planning and summarizing meeting on Mar. 19, 2019), CAR00010868–69 (docket no. 25-4 at 226–27) & CAR00011588–89 (docket no. 26-1 at 189–90); Minutes (Nov. 13, 2019), CAR00043595–96 (docket no. 29-7 at 438–39); Minutes (Jan. 23, 2020), CAR00056777–79 (docket no. 31-7 at 191–93); Minutes (Mar. 12, 2020), CAR00062694–96 (docket no. 32-3 at 418–20).  After the EA was published, WSDOT continued to meet with the Association's representatives and discuss via email issues raised by the Association.  *See* Minutes (Sept. 15, 2020), CAR00081711–14 (docket no. 34-1 at 170–73); Minutes (Oct. 14, 2020), CAR00084322–23 (docket no. 34-4 at 766–67); Emails (Nov. 2020), CAR00096018–28 (docket no. 35-3 at 325–35); Emails (Nov. 2020–Jan. 2021), CAR00097719–23 (docket no. 35-5 at 1176–80) (duplicative of CAR00096160–61 & CAR00096218_19 (docket no. 35-4 at 80–81 & 138–39) and CAR00096810–13 (docket no. 35-5 at 267–70)); Emails (Jan. 2021), CAR00099653–54 (docket no. 35-7 at 36–37); Email (Feb. 2021), CAR00097963–67 (docket no. 35-5 at 1420–24); Minutes (May 11, 2021), CAR00108332–34 (docket no. 37-2 at 213–15).  The Association expressed its concerns about the EA in a letter dated August 6, 2020, attached to which was a memorandum authored by Michael Read, P.E. of Transportation Engineering NorthWest; both the Association's comments and the FHWA's thorough responses were incorporated into the subsequent FONSI.  *See* FONSI at Comment L3 (docket no. 37-8 at 501–521).

ORDER - 14

attached as Appendix 2 to the FONSI (docket no. 37-8 at 565–628).  The FONSI also

outlined certain mitigation commitments, including the installment of signs on, at a

minimum, 228th Street SE, westbound approaching 29th Drive SE, and 17th Avenue SE,

northbound approaching 220th Street SE, directing drivers to use public streets, as

opposed to the private roads within the Canyon Park Business Center.  _See_ FONSI at



Addendum to City of Bothell's Draft EIS, Attachment C at Fig. 2 (docket no. 33-2 at 665) (modified).

§ 5.1.1 (docket no. 37-8 at 320).  The

Court has modified the adjacent map to

show the approximate locations of such

warning signs, using red hexagons and

arrows indicating the direction of travel.

The FONSI further indicated that

WSDOT "is proposing mitigation to

offset traffic impacts" at the 20th

Avenue SE / 220th Street SE intersection

(identified as "1" in the above map and as P2 in the TDR), which "_currently_ operates

poorly and would continue to operate poorly with the Build Alternative."  _Id._ (emphasis

added).  Such mitigation, however, is outside the scope of the Project and was deemed

"not necessary to mitigate Project effects."  _Id._  The Association contends that the

FONSI, and the associated failure to develop an EIS, constitutes a violation of NEPA.

The FHWA and WSDOT express the opposite view.

1   **C.      Bothell Final EIS**

2           In December 2020, between the submission of the EA for the Project (July 2020)

3   and the issuance of FHWA's FONSI (July 2021), the City of Bothell issued the Bothell

4   Final EIS, of which the Court has taken judicial notice at the Association's request.[7]  *See*

5   Bothell Final EIS, Ex. A to Quihuis Decl. (docket no. 49-1); *see also* Minute Order at

6   ¶ 1(a) (docket no. 56).  The Bothell Final EIS concerned a proposal to update the subarea

7   plan for the Canyon Park neighborhood, which includes the Canyon Park Business

8   Center.[8]  *Id.* at Fact Sheet & Fig. 1 (docket no. 49-1 at 8 & 25).  The Bothell Final EIS

9   considered five alternatives, summarized as follows:

10          •   the "No Action" alternative, which would retain current Future Land
                Use designations and zoning, as well as current Regional Growth Center
11              ("RGC") boundaries (733 acres);

12          •   the "Business Plus" alternative, which would focus primarily on adding
                jobs and would reduce the RGC boundary to 613 acres;

13

14

15   _____

16   [7] The City of Bothell's Draft EIS was published a year earlier, in December 2019, and it is
     mentioned in WSDOT's TDR.  *See* TDR at § 3.3.3 (CAR00066620) (docket no. 32-8 at 1015).
17   According to the TDR, the City of Bothell's Draft EIS evaluated a "no action" alternative and
     three build alternatives, without identifying a preferred alternative.  *Id.*  Given the relative timing
18   of the City of Bothell's EIS process and the TDR, WSDOT opted to rely on the land use
     densities set forth in the City of Bothell's current comprehensive plan, known as "*Imagine*
19   *Bothell*," which was adopted in 2015.  *See id.*

20   [8] The Canyon Park neighborhood was designated as a Regional Growth Center by the Puget
     Sound Regional Council in 2009.  *See* EA at 5-4 (docket no. 38-1 at 44).  A Regional Growth
21   Center is an area in which significant business, governmental, and cultural facilities are located
     and in which growth is being planned.  *See* https://www.psrc.org/our-work/centers.  Washington
22   has 30 Regional Growth Centers.  *Id.*; *see also* RCW 36.70A.110 (requiring that comprehensive
     growth management plans designate "an urban growth area or areas").

23

- the "Live/Work" alternative, which would grow both jobs and housing, and would have the same RGC boundary as the "Business Plus" alternative;

- the "Mitigated Live/Work" alternative, which would have a smaller RGC boundary of 565 acres and permit 25% lower growth than the "Live/Work" alternative; and

- the "Preferred Middle Ground" alternative, which is similar to the "Mitigated Live/Work" alternative, but with a smaller RGC boundary (563 acres), and concentrates mixed-use structures (residential/retail or residential/office) at existing shopping centers and along the Bothell-Everett Highway.

_Id._ at Fact Sheet & § 1.1 (docket no. 49-1 at 8–9 & 22); _see also id._ at Table 1 (docket no. 49-1 at 31-33) (comparing the potential features of the various alternatives).[9]

All alternatives included (or assumed completion of) the Project, described in the Bothell Final EIS as already funded and as adding "one ETL in each direction of I-405 between south of SR 522 and SR 527, as well as . . . direct access ramps at SR 522 and near SR 527 at 17th Avenue SE." _Id._ at Fig. 6 & Table 2 at C-5 (docket no. 49-1 at 42–43). The Bothell Final EIS anticipated that, under the "Preferred Middle Ground"

---

[9] The alternatives are estimated to have the following capacities:

| Alternative | Regional Growth Center (RGC)* | | | | Full Study Area | | | |
|---|---|---|---|---|---|---|---|---|
| | Dwelling Capacity | Population Capacity | Job Capacity | Total Activity Units | Dwelling Capacity | Population Capacity | Job Capacity | Total Activity Units |
| No Action EIS Assumption* | 1,856 | 3,712 | 4,530 | 8,242 | 2,242 | 4,484 | 4,787 | 9,271 |
| No Action: Capacity Amended* | 2,029 | 3,713 | 4,430 | 8,143 | 2,654 | 4,847 | 4,804 | 9,651 |
| Mitigated Live/Work | 2,816 | 4,225 | 9,458 | 13,683 | 3,614 | 5,496 | 9,805 | 15,302 |
| Preferred | 4,075 | 6,142 | 7,598 | 13,740 | 4,687 | 7,162 | 8,305 | 15,467 |
| Business Plus | 2,687 | 4,012 | 17,209 | 21,221 | 2,915 | 4,468 | 17,350 | 21,818 |
| Live/Work | 4,498 | 6,732 | 15,143 | 21,875 | 4,726 | 7,188 | 15,284 | 22,472 |

Bothell Final EIS at Table 4 (docket no. 49-1 at 54).

alternative, the intersection of 17th Avenue SE and 220th Street SE (designated as P1

in the TDR), would perform at LOS F during both peak periods.  <u>Id.</u> at 3-43 (docket

no. 49-1 at 154).  According to the Bothell Final EIS, WSDOT's separate analysis

projected that this same intersection would operate at LOS C for both AM and PM peak

hours in 2043/2044.[10]  <u>Id.</u>  The Bothell Final EIS explained that the difference between

its and WSDOT's LOS figures resulted from "a combination of the higher overall land

---

[10] WSDOT's TDR originally estimated that the 17th Avenue SE / 220th Street SE intersection
would function at LOS B under both the Build and No Build alternatives in 2025 and 2045.  <u>See</u>
TDR at Exs. 5-13 & 5-14 (docket no. 35-8 at 342–47).  In the Errata to the EA, which was
appended to the FONSI, the LOS results for the intersection (P1) changed as follows:



Errata to EA at Exs. 5-13 & 5-14 (docket no. 37-8 at 583 & 585).  The estimated LOS for the
interchange between 17th Avenue SE and the direct access ramp (N4) was downgraded from
LOS A to LOS B for both AM and PM peak periods:



<u>Id.</u> (docket no. 37-8 at 582 & 584).  The updated LOS estimates accounted for design
refinements within the Canyon Park Business Center, the City of Bothell's 2018 addition of a
pedestrian crossing at 29th Avenue SE and 228th Street SE, which was not originally reflected,
changes to certain parameters (<u>e.g.</u>, pedestrian crossing times, lane change distances, and
intersection turning speeds) in coordination with CPBCOA, and revisions to signal timings.  <u>Id.</u>
at A2-16 (docket no. 37-8 at 580).  WSDOT characterized the LOS changes as "minor" or not
"substantial" in "overall effects as disclosed in the EA."  <u>Id.</u> at A2-17 (docket no. 37-8 at 581).
Notably, the overall LOS estimates at the 17th Avenue SE / 220th Street SE intersection for the
AM peak hour in the year 2045 and for the PM peak hour in 2025 and 2045 are essentially the
same for the Build and No Build alternatives, which is consistent with the initial TDR findings.

use growth *in the Preferred Alternative* throughout the study area as well as higher land use growth located closer to the Canyon Park park-and-ride (accessible from 17th Avenue SE only) compared to the WSDOT land use assumptions." *Id.* (emphasis added); *see also* Addendum to City of Bothell's Draft EIS, Attachment C at 15 (docket no. 33-2 at 670) ("The draft WSDOT I-405 Direct Access Ramp study evaluated the traffic operations at this location under future conditions *which generally equates to the Canyon Park No Action Alternative*.  This location was further evaluated in this memo with the higher land use growth assumed in the Canyon Park Subarea Preferred Alternative." (emphasis added)).  In other words, the disparity was not a product of some flaw in WSDOT's analysis, but rather illustrated the impact on the intersection of the City of Bothell's "Preferred Middle Ground" alternative (as opposed to the direct access ramp itself).  The Association's suggestion to the contrary, *see* Pl.'s Mot. at 9 (docket no. 50 at 15), lacks merit.  Nevertheless, the Association asserts that, following the issuance of the Bothell Final EIS, WSDOT and the Washington Division of the FHWA should have revised the EA, which would have impacted the FONSI on which it relied.  The agencies disagree.

**D.**   **Request for Judicial Notice – Swenson Opinions**

The Association has asked the Court to take judicial notice of certain materials prepared by its expert Michael Swenson.  Swenson's qualifications as a traffic engineer are not in dispute, *see* Resp. at 9 (docket no. 52), and the Court therefore takes judicial notice of his resume, Ex. C to Swenson Decl. (docket no. 49-2 at 7), as well as Paragraphs 2 and 3 of his declaration, docket no. 49-2, which indicate that Swenson is a

1  registered professional engineer and a certified professional traffic operations engineer,

2  with an undergraduate degree in civil engineering from Montana State University.

3      In his declaration, Swenson states that the technology used by WSDOT in

4  preparing the TDR, *i.e.*, Synchro, is "a deterministic traffic model that is used to calculate

5  intersection performance in areas," and that SimTraffic is a visualization tool "often used

6  as an extension of Synchro."  Swenson Decl. at ¶¶ 7 & 14 (docket no. 49-2).  The Court

7  takes judicial notice of these descriptions of programs used by WSDOT.  According to

8  Swenson, VISSIM is, in contrast, a microsimulation program that "is best used to model

9  complex traffic interactions and closely spaced intersections with freeway ramps and

10  ramp terminals, signalized intersections, and roundabouts."  *Id.* at ¶ 8.  Swenson opines

11  that VISSIM would provide more accurate results than Synchro and/or SimTraffic, *id.*

12  at¶ 11, but he offers no support for the proposition that WSDOT and/or FHWA were

13  required to use VISSIM or an equivalent system.

14      In a memorandum dated March 1, 2023, which is attached as Exhibit D to his

15  declaration, Swenson summarized the results of his VISSIM modeling as follows:

16  • No-Build PM: 74.5 sec of delay per vehicle in the network

17  • Build PM: 97.9 sec of delay per vehicle in the network, increase of 31%
       as compared to the No-Build scenario

18

19  • Northbound queues on 17th – 485 ft (no-build) increase to 660 ft (build)
       (PM Peak avg), exceeding northbound left-turn lane storage and blocking

20     several existing commercial driveways

21  • Westbound queuing on 220th – 160 ft (no-build) increase to 320 ft (build)
       (PM Peak avg)

22

23

- Increased queuing in the southbound direction on SR 527 between the No-Build and Build scenarios

Ex. D to Swenson Decl. (docket no. 49-2 at 9).  Swenson, however, does not relate this information in any meaningful way to the LOS predictions set forth in the TDR or Errata to the EA, and he does not explain why the VISSIM program predicts different outcomes than the Synchro and/or SimTraffic systems.

The Court has considered (and therefore taken limited judicial notice) of the balance of Swenson's declaration, as well as his March 2023 memorandum, for the purposes of understanding and evaluating the Association's argument that WSDOT acted unreasonably or reached erroneous results by not employing VISSIM.  The Court has concluded that such argument lacks merit for the reasons set forth in Section B(2) of the Discussion.  Because the Court has, however, reviewed the substance of the extra-record materials on which the Association has relied, the deferred portion of the Association's motion for judicial notice, docket no. 49, is GRANTED.

**Discussion**

**A.**     **Standard of Review**

A federal agency's decision not to produce an EIS may be set aside only upon a showing that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  _Dep't of Transp._, 541 U.S. at 763 (quoting 5 U.S.C. § 706(2)(A)). NEPA and its implementing regulations incorporate a "rule of reason," which ensures that federal agencies base their decisions whether to generate environmental impact statements on the "usefulness of any new potential information to the decisionmaking

1  process." _Id._ at 767.  If "an EIS would serve 'no purpose' in light of NEPA's regulatory

2  scheme as a whole, no rule of reason worthy of that title would require an agency to

3  prepare an EIS." _Id._  NEPA's EIS requirement serves two purposes:  (i) to make certain

4  that agencies "will have available, and will carefully consider, detailed information"

5  concerning any "significant environmental impacts" of their decisions; and (ii) to

6  guarantee that relevant information is provided to the larger audience, which might "also

7  play a role in both the decisionmaking process and the implementation of that decision."

8  _Id._ at 768.  To the extent that environmental consequences stem from actions outside of

9  an agency's control, the "rule of reason" operates to relieve the agency of formally

10  analyzing such environmental impacts through the EIS process.  _See id._ at 768–770.

11  **B.**   **Decision Not to Prepare an EIS**

12       Despite the Association's efforts to blur the distinction between the Project, as to

13  which it asserts an EIS should have been generated, and the City of Bothell's proposed

14  changes to the land use and zoning plan for the Canyon Park area, the Court remains

15  focused, as it must, on the federal action that is subject to NEPA and the related CEQ

16  regulations.  The only component of this federal action that the Association challenges is

17  the proposed direct access ramp linking the I-405 median and 17th Avenue SE.

18       **1.**   **Growth Projections**

19       In analyzing the impact of the direct access ramp on traffic in the vicinity of the

20  Canyon Park Business Center, WSDOT reasonably relied on the comprehensive plan

21  (_Imagine Bothell_) adopted in 2015 by the City of Bothell.  The Association's contention

22  that WSDOT should have considered one or more of the alternative plans being

23

considered by the City of Bothell in the 2019–2020 timeframe (contemporaneously with development of the TDR and the EA), all of which would allow more growth or greater density than _Imagine Bothell_, is flawed for the following three reasons.

First, when WSDOT performed its analysis, it did not know, and could not predict, which alternative the City of Bothell would choose.  Indeed, the City of Bothell's Draft EIS did not designate any alternative as the preferred one, and the plan later characterized as the "Preferred Middle Ground" alternative was not even under consideration when WSDOT conducted the analysis discussed in the TDR.  WSDOT and the FHWA's Washington Division cannot be faulted for not evaluating within the EA a level of future growth that the City of Bothell had not yet proposed or fully studied, much less decided to allow.

Second, the Project (including the direct access ramp) is anticipated to be constructed in the near future, _see_ FONSI at 2-2 (docket no. 37-8 at 298), and thus, the impact of the Project is best understood in the context of the currently expected conditions and future growth in the Canyon Park area.  Factoring in a higher level of future growth merely conflates the traffic effects of the direct access ramp with the traffic effects of the City of Bothell's "Preferred Middle Ground" or other alternative.  With regard to the former traffic effects (relating to the direct access ramp), the TDR, EA, and Errata to the EA show virtually no difference between the Build and No Build alternatives.  As to the latter traffic effects (associated with higher future growth than currently authorized), the City of Bothell actually prepared an environmental impact statement precisely because its decision is likely to "significantly" affect "the quality of

1   the environment."  *See* RCW 43.21C.030(c) (State Environmental Policy Act ("SEPA")

2   EIS requirements).  The City of Bothell's decision to further pursue or approve a new

3   comprehensive plan that will cause more traffic congestion in the vicinity of the Canyon

4   Park Business Center is beyond the scope of this lawsuit and the Court's jurisdiction.  *See*

5   RCW 43.21C.075; *see also Coal. for Sustainable 520 v. U.S. Dep't of Transp.*, 881

6   F. Supp. 2d 1243, 1260–61 (W.D. Wash. 2012) (with regard to state claims, including

7   pursuant to SEPA, that are asserted in federal court, WSDOT and its Secretary have

8   Eleventh Amendment immunity).

9          Third, the Association has not made any showing that, if the growth projections

10  associated with the "Preferred Middle Ground" alternative were used to repeat the LOS

11  analysis, the results for the Project's Build and No Build alternatives would differ from

12  each other.  The Association's reliance on the Bothell Final EIS is misplaced because the

13  Bothell Final EIS (which incorporates the Addendum to the City of Bothell's Draft EIS)

14  demonstrates only a difference between the current comprehensive plan or "No Action"

15  alternative (with a direct access ramp) and the "Preferred Middle Ground" alternative

16  (with a direct access ramp); the Bothell Final EIS does not analyze the "Preferred Middle

17  Ground" alternative both with and without a direct access ramp.  Given the outcomes to

18  date, a reasonable expectation is that the LOS for each studied intersection near or in the

19  Canyon Park Business Center would continue to be virtually the same for the Project's

20  Build and No Build alternatives with respect to the City of Bothell's "Preferred Middle

21  Ground" alternative, and that the 17th Avenue SE / 220th Street SE (P1) intersection

22  would be anticipated to operate at LOS F under the "Preferred Middle Ground"

23

alternative even if the direct access ramp were not considered.  The Association has not

carried its "heavy burden" of establishing otherwise, and has therefore not proven that

WSDOT and/or the FHWA acted arbitrarily or capriciously in computing (or relying on)

LOS values using the current *Imagine Bothell* projections.  *See* *Short Haul Survival*

*Comm. v. United States*, 572 F.2d 240, 244 (9th Cir. 1978) (observing that the arbitrary

and capricious standard is "highly deferential" and "presumes agency action to be valid,"

and that challengers bear a "heavy burden" of establishing that the agency's decision was

unreasonable or unsupported by a "rational basis").

### 2.   Traffic-Analysis-Tool Selection

The Association's assertion that WSDOT and FHWA failed to follow their own

guidelines likewise lacks merits.  Contrary to the Association's contention, WSDOT's

Design Manual did not require use of VISSIM.  WSDOT's Design Manual cautions that

"[f]orecasting demand volumes 20 years into the future can be difficult to do well," and

that some future-year measures of effectiveness ("MOEs"), for example, turn-lane queue

lengths, "should not be considered accurate," but might "be useful when comparing

various scenarios if the reported differences are substantial."  Design Manual at § 320.01

(Sept. 2020) (docket no. 37-1 at 496).  According to the Design Manual, "*the least*

*complex* and data-intensive traffic analysis software available" should be selected to

address the questions raised by a project.  *Id.* at § 320.03 (docket no. 37-1 at 498)

(emphasis added).  For a deterministic analysis, the Design Manual suggests using Sidra,

Rodel, Synchro, and/or HCS as the primary tools.  *Id.*  WSDOT selected SIDRA and

Synchro.  The Design Manual describes VISSIM as an appropriate tool for "choosing

between project-level scenarios involving multimodal traffic" or when "various transportation system elements interact." _Id._  Having quoted this guidance out of context, the Association fails to show that WSDOT was either (i) analyzing different project-level scenarios (_i.e._, different "Build" designs), or (ii) focusing, with respect to the direct access ramp's effect on traffic near the Canyon Park Business Center, on the interaction of various transportation system elements.  _See_ Pl.'s Mot. at 17 (docket no. 50 at 23).

The Design Manual cites to the FHWA's Traffic Analysis Toolbox Volume II: Decision Support Methodology for Selecting Traffic Analysis Tools ("Toolbox"), of which the Court has taken judicial notice at the Association's request.  _See_ Design Manual at § 320.08 (docket no. 37-1 at 502); Toolbox (July 2004), Ex. B to Quihuis Decl. (docket no. 49-1 at 320–427); Minute Order at ¶ 1(a) (docket no. 56).  The Toolbox "provides a methodology for selecting traffic analysis tools," and the Design Manual enumerates by facility type the methodologies that WSDOT generally uses and that "will be accepted if agreed upon by those who sign TIA [Traffic Impact Analysis] or ARR [Access Revision Report] M&A [Methods and Assumptions] Documents."  Design Manual at § 320.08 (docket no. 37-1 at 502).  The relevant facility types are as follows:

- **Freeway Segments**:  _Highway Capacity Manual_/Software (HCM/S); operational and design analysis; macroscopic, mesoscopic, and microsimulation
  . . .

- **Ramps and Ramp Terminals**:  HCM/S; operational and design analysis; DM [Design Manual]; microsimulation
  . . .

- **Intersection, Signalized**:  Sidra; Synchro; SimTraffic; HCM/S; Vissim

- **Intersection, Roundabout**:  Sidra; Rodel; HCM; Vissim

- **Corridors**:  Sidra; Synchro; SimTraffic; HCM; Vissim
- **Stop-Controlled Intersections**:  HCM/S for capacity; DM Chapter 1330 and the MUTCD [Manual on Uniform Traffic Control Devices for Streets and Highways, WAC Chapter 468-95] for signal warrants (if a signal is being considered) . . . .

*Id.* (italics in original).  As previously noted, in preparing the TDR, which was attached to the EA, WSDOT used Synchro for intersections, SIDRA for roundabouts, and the methods outlined in the HCM.  These choices were consistent with the Design Manual's guidance.

With regard to simulation models like VISSIM, the Design Manual warns that they "must be calibrated and validated for reliable results" and that they are "intended for near term operational analyses."  *Id.* (docket no. 37-1 at 503).  The Design Manual further indicates that simulation models involving long-term forecasts "should be used primarily to determine which scenarios are better than others" and they can do so only "if the resultant MOEs demonstrate significant differentiation between scenarios."  *Id.*  The Design Manual offers as an example that "if Vissim is considered to be calibrated to a given MOE within 15% of existing conditions (a very wide band), the scenarios need to show greater than 15% differentiation between each other to be significant."  *Id.*  No showing has been made that the analysis performed in this matter was for the near term, as opposed to the long term, or that two or more scenarios with significant differentiation were involved.  Thus, the Association's argument that WSDOT failed to comply with its own (or the FHWA's) guidelines by not using VISSIM is actually contradicted by the Design Manual from which the Association has extensively quoted.

The Design Manual also extinguishes any persuasive value of the Association's extra-record materials, namely, Swenson's declaration and March 2023 memorandum. The Design Manual explains why VISSIM was not an appropriate tool for the Project, and it casts doubt on the reliability of Swenson's opinions and his VISSIM results.  Even if, however, Swenson had explained why VISSIM might produce a more accurate analysis, or had correlated his VISSIM statistics in some meaningful way with the TDR's LOS figures, neither of which he did, such opinion would not have served to undermine the professional judgment of the FHWA.[11]  *See* *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have

---

[11] In response to concerns raised by the Association, the FHWA conducted an independent review of WSDOT's I-405 Traffic Model and then stated in a memorandum dated July 7, 2021:

- The traffic analysis was consistent with FHWA Traffic Analysis guidance:
  - Travel Demand Model – NCHRP 765 Analytical Travel Forecasting Approaches for Project-Level Planning and Design
  - Traffic Analysis Toolbox Volume III:  Guidelines for Applying Traffic Microsimulation Modeling Software published 2004

  and with the Puget Sound Regional Council (PSRC) Regional Travel Demand Model, and . . .

- The [P]roject would not significantly impact traffic in the vicinity of the Canyon Park Business Center.

The FHWA project team and traffic analysis subject matter experts derived the above conclusion upon the complete review of the traffic operation report provided by WSDOT and subsequent meetings and discussion of the methodology used for the Travel Demand Model and the operational VISSIM and Synchro models deployed as part of the decision-making process within the context of the alternative development.  The team developed detailed clarification questions regarding the model's development and calibration, which were submitted to WSDOT and they have sufficiently answered all questions and provided additional clarification regarding model development and coordination with PSRC for the demand model.

Memorandum at 3 (docket no. 37-8 at 144).

1   discretion to rely on the reasonable opinions of its own qualified experts even if, as an

2   original matter, a court might find contrary views more persuasive.").

3       In its reply, the Association retreats from its assertion that WSDOT's analysis was

4   flawed because it did not use VISSIM, and it instead focuses on questions about the

5   accuracy of WSDOT's traffic model that were raised prior to and during a call involving

6   Swenson, counsel for CPBCOA (Molly Lawrence), and WSDOT's attorneys and

7   consultants.  Pl.'s Reply at 10 (docket no. 57 at 15) (citing docket no. 37-7 at 1196–97).

8   In an email dated June 3, 2021, Swenson raised doubts about an image "from the 2025

9   SimTraffic model (build w/signal)," reproduced below, which, according to Swenson,

10  showed vehicles being "denied entry on the west leg of the intersection."  CAR00119555

11   (docket no. 37-7 at 1196).  The figure at issue

12  depicts a mid-block node (as opposed to an

13  "intersection"), which involves driveways on

14  the east and west of 17th Avenue SE.

15  According to Swenson, "a significant portion

16  of the vehicles exiting [a driveway on] the

17  west side of 17th are not actually entering the

18  network.  The projected volumes are 185 for

19  the PM peak hour and the range shown in the figure is between 101 to 200.  This could

20  result in a reduction of up to 15%– 20% of the NB [northbound] traffic on 17th not being

21  reflected in the Build scenarios."  _Id._  Swenson requested that "the model be updated to

22  reassign the left-turns from the west side of 17th to right-turns and complete a u-turn

23

maneuver at the RAB [roundabout]."  CAR00119555–56 (docket no. 37-7 at 1196–97).  In other words, Swenson speculated that vehicles attempting to turn left from the west-side driveway would instead turn right, proceed southbound to the roundabout near the Canyon Park P&R, and use the roundabout to essentially perform a U-turn to reorient themselves in the northbound direction.

On July 1, 2021, one of WSDOT's consultants (Barrett Hanson) responded to the question that had been posed via email and during the subsequent call "about nodes on 17th Avenue SE" by indicating that "[o]ur team has reviewed the CPBCOA's additional concerns about mid-block model load points, and we continue to stand behind our conclusions from the EA traffic analysis."  CAR00119554 (docket no. 37-7 at 1195).  Hanson further explained:

> As we discussed during our last meeting, for the NEPA EA, we are reporting intersection level of service and delay at study intersections *per industry standard practices*.  At the request of the CPBCOA and your team, WSDOT provided queuing analysis information at intersections of interest within the CPBC under the No Build and Build Alternatives.  *This is outside of our normal performance reporting metrics* and was provided at the request of CPBCOA.  This analysis was completed using the preferred WSDOT approved traffic analysis tools (Synchro/SimTraffic).  The developed Synchro model was reviewed by your team.  *WSDOT and your team mutually agreed upon model input parameters and coding suggestions that were incorporated in the final model*.  We maintain that our NEPA analysis is appropriate and consistent with WSDOT and FHWA guidance.

*Id.* (emphasis added).

Contrary to the Association's accusation, WSDOT did not fail to provide an explanation for refusing to revise the model as Swenson asked, and it did not fail to "follow state and federal guidelines and protocols."  Pl.'s Reply at 10 (docket no. 57 at

1    15).  As indicated in Hanson's email, WSDOT performed an analysis that was consistent

2    with industry standards, and Swenson's suggestion was "outside . . . normal performance

3    reporting metrics."  CAR00119554 (docket no. 37-7 at 1195).  WSDOT used parameters

4    and coding on which it and CPBCOA had "mutually agreed," and the Court will not

5    second guess WSDOT (or the FHWA) with respect to a disagreement between the parties

6    concerning methodology.  *See* *Coal. for Sustainable 520*, 881 F. Supp. 2d at 1260 ("a

7    disagreement over methodology does not give rise to a claim under NEPA" (citing

8    *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985)

9    (NEPA does not require courts "to resolve disagreements among various scientists as to

10   methodology"), and *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 526

11   (9th Cir. 1994) ("NEPA does not require us to decide whether an EIS is based on the best

12   scientific methodology available or to resolve disagreements among various experts.")).

13       **3.   Conclusion Regarding EIS**

14       The Association has not raised any question or doubt as to whether the agencies

15   appropriately relied on growth projections outlined in the comprehensive plan currently

16   in effect, *i.e., Imagine Bothell* (2015).  The Association also has not shown that the

17   agencies failed to select the proper traffic analysis tools to perform their work or

18   unreasonably rejected a proposal to evaluate the level of service at a mid-block node, as

19   opposed to an intersection.  The Court concludes, as a matter of law, that WSDOT, the

20   FHWA, and the individual defendants did not act arbitrarily or capriciously in preparing

21   the EA, rather than an EIS, or in finding that the Project would have no significant impact

22   on the human environment.  The Association has not demonstrated that an EIS would

23

ORDER - 31

1    serve any purpose in light of NEPA's regulatory scheme as a whole, and the portion of

2    the Association's motion for summary judgment, docket no. 50, seeking to require the

3    preparation of an EIS is DENIED.[12]

4    **C.    <u>Decision Not to Revise or Supplement the EA</u>**

5           In connection with requiring federal agencies to take a "hard look" at the potential

6    environmental consequences of proposed actions, NEPA imposes "a continuing duty to

7    supplement previous environmental documents." <u>*Price Rd. Neighborhood Ass'n v. U.S.*</u>

8    <u>*Dep't of Transp.*</u>, 113 F.3d 1505, 1509 (9th Cir. 1997).  An agency, however, "need not

9    start the environmental assessment process anew with every change in a project." <u>*Id.*</u>

10   Rather, supplementation is required only when the agency "makes substantial changes in

11   the proposed action that are relevant to environmental concerns." <u>*Id.*</u> (quoting former 40

12   C.F.R. § 1502.9(c)(1)(i), renumbered as 40 C.F.R. § 1502.9(d)(1)(i), while observing that

13   this CEQ regulation applies to an EIS, and not explicitly to an EA or FONSI); <u>*see also*</u>

14   23 C.F.R. § 771.130(a) (requiring the FHWA to supplement an EIS when it determines

15   that "[c]hanges to the proposed action would result in significant environmental impacts

16   that were not evaluated in the EIS" or "[n]ew information or circumstances relevant to

17   environmental concerns and bearing on the proposed action or its impacts would result in

18   significant environmental impacts not evaluated in the EIS").

19

20   ───────────────────

21   [12] The Court declines to address the federal defendants' alternative argument that, for purposes
     of NEPA, any degradation in the level of service at surface street intersections does not
     constitute an impact on the "human environment." <u>*See*</u> Fed. Defs.' Mot. at 18–20 (docket

22   no. 55).

23

1    The Association's argument that the EA should have been updated after issuance

2  of the Bothell Final EIS lacks merit for three reasons.  First, the Bothell Final EIS did not

3  concern a change, let alone a substantial change, to the Project.  Rather, it related to a

4  proposed revision to the City of Bothell's comprehensive growth management plan.  The

5  Bothell Final EIS assumed, for purposes of its analysis, that the Project, including the

6  direct access ramp linking the I-405 median with 17th Avenue SE, will be built.  Nothing

7  contained in the Bothell Final EIS altered the scope or impact of the Project and/or direct

8  access ramp.  Second, the information in the Bothell Final EIS was not "new."  WSDOT

9  and the FHWA were aware, long before the Bothell Final EIS was published, that the

10  City of Bothell was considering proposals to allow greater density in the Canyon Park

11  RGC.  Indeed, the City of Bothell's Draft EIS was referenced in both the TDR and the

12  EA.  *See* TDR at § 3.3.3 (docket no. 35-8 at 295–96); EA at § 5.3 (docket no. 38-1 at 44).

13  Third, nothing in the administrative record indicates that any significant environmental

14  impact of the Project, as opposed to the City of Bothell's amendment to its

15  comprehensive plan, was not evaluated in the EA.  The Court concludes, as a matter of

16  law, that NEPA was not violated when the EA and FONSI were not supplemented

17  following issuance of the Bothell Final EIS.  *See Tri-Valley CAREs v. U.S. Dep't of*

18  *Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) ("Supplementation is not required 'every

19  time new information comes to light after the EIS is finalized.  To require otherwise

20  would render agency decision-making intractable, always awaiting updated

21  information.' . . .  Whether new information requires supplemental analysis is a 'classic

22  example of a factual dispute the resolution of which implicates substantial agency

23

ORDER - 33

expertise.'" (quoting _Marsh_, 490 U.S. at 373 & 376)).  Given this ruling, the Court need not reach the issue of whether injunctive relief would be appropriate in this matter.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)     The previously deferred portion of the Association's motion for judicial notice, docket no. 49, is GRANTED;

(2)     The Association's motion for summary judgment, docket no. 50, is DENIED;

(3)     The motion for summary judgment, docket no. 54, brought by Millar and WSDOT is GRANTED, and the Association's claims against these defendants are DISMISSED with prejudice;

(4)     The motion for summary judgment, docket no. 55, brought by Buttigieg, Pollack, Rizzo, and the FHWA is GRANTED, and the Association's claims against these defendants are DISMISSED with prejudice;

(5)     The Clerk is DIRECTED to enter judgment consistent with this Order, to send a copy of the Judgment and this Order to all counsel of record, and to CLOSE the case.

IT IS SO ORDERED.

Dated this 25th day of July, 2023.

Thomas S. Zilly
United States District Judge